## Baeder-Adamson Co. v. F. W. Tunnell & Co., Inc.

*Contracts—Construction—Selling price based upon cost of manufacture, plus stipulated profits—Bill for accounting.*

A & Co. entered into a contract with B & Co. to purchase glue manufactured by the latter between July 1, 1919, and July 1, 1921, the glue to be billed at the per pound cost of manufacture, as shown by the books of B & Co.; this cost to be based upon all charges entering into the manufacture of glue, but not to include any expenses incident to the maintenance of their sales force, plus the cost per pound of stock used in manufacture, plus a fixed profit at the rate of 2 cents per pound. A controversy having arisen between the contracting parties as to what should be included under the cost of manufacture and what allowance was to be made, A & Co. refused to pay the balance claimed, and the accountants employed by them reported that, upon examination of the books of B & Co., they found errors and overcharges in the method of accounting. A & Co. thereupon filed a bill in equity, praying for an account and for an order requiring the production of books and papers and for general relief. A & Co., before entering into the contract, failed to examine the books of B & Co. to determine the precise system employed by them. Had they done so, they would have ascertained that they had maintained a uniform system of accounting in which no record was kept of the residuum from the glue kettles, and that no credit was given of its value as against the cost of the manufacture or cost of raw material entering into it. From this residuum were manufactured by-products of great value. A & Co. claimed that the net profits from the sale of the by-products should be deducted from the cost of manufacture. A & Co. had seen a number of B & Co.'s statements in which no such deduction was made, and had paid for glue for the first year of the contract without protest. A & Co. also contended that interest on borrowed money should not be charged as entering into the cost of manufacture. B & Co. had always charged interest on borrowed money to the cost of manufacture, and had so informed A & Co. before the contract was entered into, and thereafter, when the statement of costs, containing the charge of interest, was presented to A & Co. A & Co. then agreed that the charge was proper and paid it for the first year: *Held,* (1) that the profits on the by-products, in view of the manner in which B & Co.'s books had been kept and the usage of their business, was not to be credited as a part of the cost of manufacture; and (2) that interest paid on borrowed money, in view of the practical construction placed upon the contract by the parties, was a proper charge as a part of the cost.

Exceptions to adjudication. C. P. No. 5, Phila. Co., June T., 1921, No. 9658, in Equity.

*George W. Harkins,* for plaintiff; *H. P. Brown,* for defendant.

MONAGHAN, J., Oct. 4, 1924.—On June 6, 1919, F. W. Tunnell & Company, Inc., the defendant herein, entered into a written contract with the firm of Baeder, Adamson & Company, by the terms of which they agreed to manufacture the glue and the firm agreed to purchase and take one-half of all the glue manufactured by the defendant between July 1, 1919, and July 1, 1920, and between July 1, 1920, and July 1, 1921; the glue to be billed "at the per pound cost of manufacture as shown by the books of account of the said F. W. Tunnell & Company, Inc., this cost to be based upon all charges entering into the manufacture of glue, but not to include any expenses incident to the maintenance of the sales force of said company, plus the cost per pound of stock used in the manufacture of glue, plus a fixed profit at the rate of two cents per pound."

The firm of Baeder, Adamson & Company was subsequently incorporated under the laws of the State of Massachusetts as the Baeder-Adamson Company, and duly registered as a foreign corporation in the State of Pennsylvania. The contract was assigned by the firm to the corporation (the plaintiff herein) and it was accepted by F. W. Tunnell & Company, Inc., as a party to the contract.

Deliveries of glue were made in accordance with the contract, which stipulated for payment on the 10th of each month for the glue delivered during the preceding month. The exact prices which F. W. Tunnell & Company, Inc., were entitled to charge under the terms of the contract were not ascertainable immediately, and during the first year the glue was billed at 20 cents per pound, a price agreed upon by the parties as an approximate charge.

When the accounts were closed at the end of the first year, F. W. Tunnell & Company, Inc., sent to the plaintiff, on July 16, 1920, a summary or statement showing the cost of manufacture to have been .2651 per pound; to this was added 2 cents per pound as the "fixed profit" to be paid defendant, thus making a price of .2851 per pound for all glue manufactured and delivered to the plaintiff to July 1, 1920. During the first year the plaintiff had paid for the glue delivered at the approximate charge of 20 cents per pound; after receiving the statement for that year from the defendant, the plaintiff, having made such investigation and inquiry as its officers desired to make as to the accuracy of the said statement presented, paid the entire balance claimed by the defendant, calculated on a basis of .2851 per pound for all glue delivered during said first year.

From July 1, 1920, the defendant continued to deliver glue to plaintiff; but it was mutually agreed to terminate the contract on Feb. 28, 1921 (instead of July 1, 1921, as provided in the original contract) ; and it was further agreed that deliveries made during the portion of the second year should be billed at the approximate charge of 22 cents per pound, the actual cost of manufacture to be determined at the end of the period. Accordingly, on April 11, 1921, F. W. Tunnell & Company, Inc., having made full delivery of the glue for the second period, sent a final statement to the plaintiff, showing the charges that entered into the cost of manufacturing the glue for that period, and that it cost .31569 per pound; this cost, together with the "fixed profit" of 2 cents per pound, made a price of .33569, which was claimed as the unit price for the glue delivered during the second period of the contract. Baeder-Adamson Company refused to pay the balance claimed, and employed accountants to examine the books of the defendant. The accountants made an examination and reported to the plaintiff that there were errors and overcharges in the method of accounting employed by the defendant. Whereupon, Baeder-Adamson Company filed the bill in equity in this case, averring, *inter alia,* that when the defendant, at the end of the first year, rendered the statement purporting to explain the cost, as shown by its books, of manufacturing the glue delivered, and fixing the price at 28½ cents per pound, the authorized agent of the defendant represented to the plaintiff that the statement was correct and showed the actual cost of the glue and the amount due the defendant according to its books; and, relying upon and believing the statement and representations to be correct and true, the plaintiff paid the amount shown to be due according to the statement; that, nevertheless, the statement and representations were incorrect and false and did not show the true cost of the glue— the cost as shown by the statement being greatly in excess of the actual cost; that in the calculation of costs there were overcharges and charges which were not proper costs of manufacture, and there were omissions of credits which should have been allowed. That the statement sent to plaintiff on April 11, 1921, showing the method of ascertaining the cost of manufacturing the glue delivered during the remaining eight months of the contract and fixing the price at 33½ cents per pound, plaintiff avers, is incorrect; and that the accountants employed by plaintiff examined the defendant's books of account for the period from July 1, 1920, to Feb. 28, 1921, and reported that

the same contain overcharges and fail to allow credits, which, with the amount paid by plaintiff in excess of the actual cost of the glue manufactured during the first year, materially reduced the amount of the indebtedness to the defendant; and upon a true and final settlement of accounts between them, it would appear that F. W. Tunnell & Company, Inc., is indebted to the Baeder-Adamson Company.

The bill contains prayers for an account; for an order requiring production of books and papers, and for general relief.

The defendant filed an answer, averring that the statement furnished to plaintiff at the end of the first year of the contract was correct, and the cost per pound of manufacturing was arrived at in accordance with the terms of the contract, excepting that the statement did not include administration expenses properly chargeable to cost of manufacture. It was denied that an authorized agent of the defendant represented to the plaintiff that the statement was correct, or that the plaintiff paid the amount shown by the statement to be due in reliance upon such representations, or that the statement was false or incorrect in any respect; and it was averred that upon the receipt of the statement dated July 16, 1920, acting upon the invitation of the defendant, plaintiff made a thorough examination of the defendant's books, records and computations for the purpose of verifying the statement, and, as a result of the investigation, acknowledged its correctness and paid the amount thus shown to be due. The answer further averred that there should have been included in the statement of cost of manufacture of glue during the second period an item of cost of $8500, representing administration expenses properly chargeable to plaintiff, and that, with this addition, the statement is approximately correct. That there are overcharges alleged in the bill, or that the glue department should be credited with the by-products, or that the cost of manufacturing was increased, as alleged by the plaintiff, was denied; and it was also denied that there were any items of overcharge or omission of credits in the statements submitted to plaintiff, or that any agent of the defendant made any false representations, or that the plaintiff had paid any sum in excess of the amount actually due, or that there has not been a final settlement between the parties for the first year of the contract. The answer denied that the defendant is indebted to plaintiff and that the plaintiff is entitled to an accounting relating to the first year; and averred that, upon an accounting for the latter period of the contract, there is due $82,220.55 to defendant by plaintiff. Defendant prays that an account be stated and a certificate be awarded to defendant for the amount due.

Exceptions were filed to the answer because there was no admission or denial that the books showing the transactions of the business were in the possession of the defendant. A stipulation was thereupon filed, in which counsel agreed that the bill might be considered amended by adding an averment that the books kept by the defendant during the first year of the contract were kept in the same manner as those used in the eight months of the second year, and that they contained the same character of charges, the same items and the same omissions of credit. It was also agreed that the answer should be amended by naming specifically the books in the possession of the defendant showing cost of manufacture during the first year. The defendant denied that plaintiff was entitled to production or inspection of these books. Plaintiff's counsel thereafter filed a motion for an order on defendant to produce the books in question. After testimony taken in support of the motion, the court, on Jan. 10, 1923, ordered defendant to produce for the inspection of plaintiff the cash disbursement book, operating account in the general

ledger, journal, part of accounts, payroll cards and original invoices, together with such other books, papers and records as are necessary for verification of the accounts of glue manufactured during the period that the contract between plaintiff and defendant was in operation.

The cause was heard on bill as amended, answer as amended, replication and proofs.

At the trial, it was admitted by counsel for the defendant "that there were mistakes with respect to four of the items set forth in the statement of July 16, 1920, without going into the question of whether those mistakes were in favor of or against the defendant; and that with respect to those items, the plaintiff is entitled to have the account retaken." The items to which this admission related are "superintendence; insurance; taxes; departmental expenses; light, heat, power and supplies."

The evidence shows that the defendant, in manufacturing glue for the plaintiff, derived a substantial net profit from the sale of by-products, this sum in the first year amounting to $39,000, but did not credit the plaintiff with any sum in that regard. Plaintiff claimed that credit should be allowed for the value of the by-products in determining the cost of manufacturing the glue. Plaintiff further claimed that the charge of "interest on borrowed capital," made by the defendant, did not properly enter into the cost of manufacture, and, furthermore, there was an error in the charge for "depreciation."

The court filed an adjudication containing findings of fact, and concluded, as a matter of law, that the contract between the parties "specifically provides in plain terms that the cost of the manufacture of glue is to be based upon all charges entering into the manufacture as shown by the books of account of the defendant;" that "in the books of account kept by defendant there was no credit allowed for by-products in ascertaining the cost of manufacturing glue;" "interest paid for borrowed capital was charged against the costs;" that "this method was uniformly employed by the defendant;" "there was no fraud or concealment practiced," and, therefore, the "plaintiff is bound, under the terms of the contract, to accept the book entries honestly made." The court further determined that a certain item of "depreciation" should not be charged against cost, and ordered that the account be restated and plaintiff be decreed to pay the balance due the defendant.

Defendant did not file any exceptions to the adjudication, and this eliminates that item—"depreciation"—from our consideration.

The plaintiff filed exceptions, a number of which raise the substantial questions (1) whether, under the contract, it should not be credited with the value of the by-product in determining the cost of the glue manufactured; (2) whether the item of "interest on borrowed capital," which defendant charged against the cost of manufacture, should not be disallowed.

The determination of these questions involves the construction and interpretation of the seventh paragraph of the contract.

In the negotiations leading up to the execution of the contract, a draft of a tentative contract was submitted to Baeder, Adamson & Company by the defendant. Each paragraph contained a distinct subject-matter, preceded by a heading or title descriptive thereof. These titles were, "Articles," "Quantity," "Price" and "Terms." Each paragraph of the draft also appears in the signed contract, and in substantially the same language, excepting that the titles are omitted. The paragraph entitled "Price" in the draft contains substantially the same language as that of the seventh paragraph of the contract, but in the latter the title "Price" is omitted. But the opening language of the paragraph, "that the glue manufactured and delivered to Baeder, Adam-

son & Company shall be billed," shows as clearly that the subject-matter of the paragraph was the billing or statement of price of the glue manufactured and delivered as if the title "Price" had preceded it. The language just quoted was immediately followed, both in the form of tentative contract and in the signed contract, by the clause "at the per pound cost of manufacture as shown by the books of account of said F. W. Tunnell & Company, Inc.," to which was added, "this cost to be based upon all charges entering into the manufacture of glue, but not to include any expenses incident to the maintenance of the sales force of said company." In the tentative form or draft, the last clause above quoted was in parenthesis; in the signed contract, no mark precedes the clause, excepting a comma after the abbreviation "Inc.," but after the last word in the clause as quoted there appears a short horizontal mark or dash. The difference in the marks between which the clause appeared does not change its parenthetical character; and, being parenthetical, it unquestionably refers to, and its function is to codify or define, the general language "per pound cost of manufacture as shown by the books of account of F. W. Tunnell & Company, Inc.," which immediately preceded it. The parenthetical clause in itself contains all the bases which constitute the thing which the parties had chosen to denominate the cost of manufacture of glue as shown by the books of the company.

We would ordinarily include in the cost of the manufacture of the glue the price or cost paid for material entering into the manufacture; but in the contract before us, immediately following the language "per pound cost of manufacture as shown by the books of F. W. Tunnell & Company, Inc.," and its parenthetical clause, appears the added item "plus the cost per pound of stock used in the manufacture of glue." If this latter, that is, cost of stock used, had already been included in the cost of manufacture as shown by the books of the company, there was no need of specifically mentioning it as an addition to that cost. We cannot, however, regard the specific mention of it as being without purpose or meaning. The parties obviously intended it to be, not an item in the thing they termed the cost of manufacture, but a separate and distinct item of the price at which the glue was to be billed. This view appears to be followed in the cost sheets furnished by the defendant to the plaintiff, in which appear two separate headings, "Manufacturing Expenditures," which contain no charge for or reference to cost of glue stock, and a separate heading, "Cost of Glue Stock."

The last clause of the seventh paragraph of the contract is, "plus a fixed profit at the rate of two cents per pound." This item cannot in any sense be regarded as an item in the cost of manufacture, or of the cost of the glue stock used, but is an additional element of price.

The seventh paragraph of the contract, therefore, has for its subject the price of glue manufactured and delivered. This price, in our view of the contract, comprises three separate and distinct elements: (1) The per pound cost of manufacture—this cost to be based on all charges entering into the manufacture as shown by the books of account of the company, but not to include the expenses incident to the maintenance of the sales force of the defendant; (2) the per pound cost of stock used in the manufacture of glue; (3) a fixed profit at the rate of 2 cents per pound.

The first element of price does not include expenses incident to the maintenance of the sales force of the defendant, because that is expressly excepted. Nor does it include the cost of glue stock used, because that is a separate and distinct item of price. Otherwise, the first element of price embraces "all

charges entering into the manufacture of glue *as shown by the books of account*" of the defendant company.

What is the meaning of the clause just quoted? The parties to the contract knew each other and knew the glue business, for each had been engaged in the manufacture of glue for not an inconsiderable number of years. It is highly probable that both parties anticipated difference of opinion as to the precise charges entering into the manufacture and the proper apportionment of the expenses of administration, operation and overhead. Whatever may have been the private and unexpressed opinion of the parties as to a theoretically correct system of cost accounting, by the use of the words "as shown by the books of account" of the defendant company, they obviously selected the system of accounts maintained by the defendant as the standard for the computation of the first element of price. The representatives of the plaintiff, before the execution of the contract and thereafter, had the right to examine the books of account of the defendant to determine the precise system employed by it. Had they done so, they would have discovered that the defendant, before and after the execution of the contract, had maintained a uniform system of accounting in which no record was kept of the residuum from the glue kettles, and in which no charge was made for the value of the residuum against any branch of the defendant's business, and that no credit was given for its value as against the cost of the manufacture of glue or cost of raw material entering into it. The plaintiff having undoubtedly adopted by the terms of the contract the method of accounting of the defendant, it is bound thereby, even though its representatives had not inquired into the details; and since the defendant's books or system of accounting showed that it never credited value of by-products against the cost of the manufacture of glue, such credit cannot be considered in the computation of the first element of price.

Having arrived at the conclusion that the plaintiff is not entitled to credit for the value of by-products in the calculation of the first element of price, a query arises whether it is entitled to such credit, under the terms of the contract describing the second element of price, viz., "per pound cost of stock used in the manufacture of said glue." It will be noted that in the description of the second element of price it is not provided that the cost should be as shown by the books of account of F. W. Tunnell & Company, Inc. The presence of this clause in the description of the first element of price and its absence in that of the second is significant and shows that the parties did not bind themselves to the cost of glue stock used "as shown by the books of account" of the defendant.

What, then, is the meaning of the phrase "cost per pound of glue stock used in the manufacture of said glue?" For many years prior to the execution of the contract the parties had been engaged in the manufacture of glue. In the manufacture of that commodity a residuum is left in the kettles after the extraction of the glue from the raw stock. The plaintiff, or its predecessor, in the conduct of their business, did not have facilities to convert the residuum into other by-products. It, therefore, sold the residuum as it came from its glue kettles, and its system of cost accounting credited the proceeds to the purchase price of the raw material of which it was originally a part, thus fixing the cost of stock used in the manufacture of its glue. While the principal business of the defendant was the manufacture of glue, it had the facilities for the conversion of the residuum into several other by-products, and three departments, known respectively as the glue, the grease and the fertilizer, were operated by it. It has been the uniform custom of the defendant,

prior to and subsequent to the execution of the contract, to turn over the residuum of its glue kettles to the grease department, and, after the grease was extracted, the balance was turned over to the fertilizer department. The by-products were sold, and whether they netted a profit or otherwise in the system of accounting maintained by the defendant, the proceeds of the sale of the residuum or by-products, or the net profits derived therefrom, were not charged or credited to either the purchase price of the raw stock or to the cost of the manufacture of glue.

The evidence does not show that either party, at the time of the execution of the contract, knew the method employed by the other, of treating the value of the by-products in their system of accounting, in order to determine the cost of glue stock used or the cost of the manufacture of the glue. It is, therefore, probable that each of the parties placed a construction upon the words "cost of stock used in the manufacture of glue" in accordance with their respective conceptions of the meaning of these words, acquired from practical experience in their own business and system of accounting.

The evidence does not show that the meaning of the words last quoted has been fixed by custom, but a number of experts called at the trial expressed the opinion that correct cost accounting requires the value of the residuum to be deducted from the purchase price of raw material in computing the actual cost of manufacture. Standard works on cost accounting, however, lay down no positive rule requiring the deduction of the value of the residuum or by-products from the price of raw material to determine the cost of glue stock used.

In Nicholson on Cost Accounting, 50, it is said: "Complications sometimes arise in the treatment of scrap materials used in making by-products. The custom is to determine the per cent. of the original material so used and consider its cost as the material cost of the by-product, this being deducted from the cost of the primary product. If, however, there is no way of determining the percentage of the waste used, except at considerable expense, or if it varies greatly in quantity and quality, its scrap value is estimated, and when the by-product is sold, the amount received for it is usually entered under the head of sundry income. When this last method is used, no deduction is made for material cost of scrap value."

In a pamphlet issued by the Research Department of the National Association of Cost Accountants, it is said: "To a great extent the method of accounting depends on (1) the character of the industry; (2) the volume and value of the by-product in comparison with those of the main product; (3) the desire of the management to get accurate costs with a view to controlling them at their source. It is difficult to lay down any hard and fast rule for by-product accounting which can be generally followed, because each plant has individual peculiarities to be considered. The same method of accounting may not be suitable for two plants in the same industry, because, for one reason, the product may not be processed in the same way. . . . The first method of by-product accounting, which probably is used more than any other, is to record only the sales and sales returns of by-products. One general account, or a separate account for each by-product, may be kept, depending on the variety of by-products sold and the extent to which the management wishes to go in obtaining data for analysis. The excess of sales over sales returns, that is, net sales, is usually closed into the current profit and loss account, and entered in the other income or miscellaneous income section of the profit and loss statement, instead of being treated as reduction of manufacturing costs."

When we consider the nature and character of the business conducted by

the parties, the different manner in which they treated the by-products in their system of accounting in their several establishments, the absence of any technical or customary meaning of the words "cost of stock used in the manufacture of glue," and, further, the words themselves, we are of opinion that the clause is reasonably susceptible of two meanings: (1) That all raw material thrown into the kettle is considered as used in the process of manufacturing glue. If this meaning be correct, it would not require the value of the by-product to be deducted from the price of the raw material to determine the cost of the stock used in the manufacture. (2) All material which constitutes the raw stock in the vat is not actually used in the sense of being entirely consumed in the manufacture of glue. If this meaning be the correct one, and if the residuum is sold, or if it has value which can be estimated, there would appear to be reason for the claim that the value or the proceeds of sale should be credited to price of raw material in determining the cost of stock used. The plaintiff might have understood the clause in the sense of the second meaning. The defendant might have understood it in the sense ascribed by the first meaning. In our opinion, the meaning of the clause is not clear, but is ambiguous and bears two interpretations. Where a contract may have two interpretations, the court will follow that which the parties have acted upon as being indicative of the sense as originally understood by the parties.

We will, therefore, inquire whether the parties by their conduct have placed a construction upon the doubtful clause.

On July 16, 1920, the defendant company rendered to plaintiff a statement purporting to show the per pound cost of manufacturing glue during the first year of the contract. The statement did not contain all the details of the defendant's books, but was a summary under the general headings of the code of the defendant's accounting system. In arriving at the production figure of .2651 per pound, the defendant had actually given no credit for the value of any by-products. The stock cost per pound of the glue made, as shown on that statement, was higher than had been anticipated by the parties, and, following plaintiff's receipt of this statement, William Adamson, the president of the plaintiff company, and Schofield, its auditor, called upon Harold Tunnell, president of the defendant company, at its office, for the purpose of ascertaining whether any credits had been omitted from the statement or some error made in any of the items set forth. At this interview the parties mentioned and Young, Tunnell's assistant, were present, and the statement was before them and formed the basis of discussion, of which the cost of raw material purchases, as shown by the statement, was one of the principal subjects. The plaintiff's representative inquired what became of the glue refuse, and was told it was used by the defendant's fertilizer department. The plaintiff's representative testified that they supposed credit for by-products had been allowed by defendant in arriving at the figures set forth in the statement of July 16, 1920, under the heading "cost of glue stock," and admit that they did not suppose such credit had been given in arriving at any of the amounts set forth in the statement under the head of "Manufacturing Expenditures."

It also appears from the testimony, and the trial judge so found, that at the time of the interview plaintiff's representatives were entirely familiar with the meaning of each of the items set forth in the statement of July 16, 1920, under the heading "Cost of Glue Stock," and knew that in arriving at the figures on each of the items no credit had been allowed for by-products. Furthermore, the fact that in the statement of July 16, 1920, no credit was given

for by-products in arriving at the stock cost per pound of glue plainly appears on the face of the statement itself.

The trial judge also found on competent evidence that the customary practice of preparing cost statements, when credit is to be given for by-products, is to set down the value of by-products as a separate item, deducting the same from the cost of raw materials. This was the method employed by the plaintiff company itself. Such deduction did not appear in the cost sheet, and the trial judge found that at the time of the interview to which we have referred, both Adamson and Schofield were informed as to the general nature of the several items which went to make up the principal items designated in the statement under the heading "Manufacturing Expenditures," and knew that in arriving at the amounts set opposite each of the items no credit had been allowed for by-products.

In the statement the defendant informed plaintiff: "Books, records and computations are all open to your inspection for verification of these accounts, if required." The evidence shows that plaintiff's representatives were given every opportunity to ascertain the accuracy of the items set forth in the statement, and every question which they asked was answered truthfully.

According to the rate per pound set forth in the statement of July 16, 1920, the balance due defendant from plaintiff on said date for glue delivered by defendant during the first year of the contract was approximately $86,000. The plaintiff was billed for the said amount and paid the same in full subsequent to the interview. Thereafter the plaintiff made no claim against the defendant that the statement of July 16, 1920, was incorrect in any particular whatever until the Spring of 1921, at which time all the glue had been manufactured and delivered to the plaintiff under the contract.

From all these facts, which are found substantially by the trial judge on sufficient evidence, we are convinced, notwithstanding the plaintiff's protestations to the contrary, that its conception of the meaning of the phrase "Cost of stock used in the manufacture of glue" was the same as that of the defendant.

We are convinced that both the plaintiff and the defendant placed a practical construction on the doubtful language of the phrase in question, which construction eliminated any credit for value of by-product to the cost of the raw material or to the cost of manufacture. Therefore, our conclusion is that the value of by-products under the contract was not intended by the parties to be a credit to be deducted from either the first or second element of the price.

This being so, it is immaterial that profit was made by the defendant on the sale of the by-product.

To argue that the clause, a "fixed profit at the rate of two cents per pound," which is the third element of the price, has any bearing upon the subject of the by-products is to assume the fact to have been proven. The question relating to by-product is determined by the provisions preceding that clause, and which point out the method of arriving at the cost of manufacture and the cost of glue stock used. If those costs did not include a credit for by-products—and we are of opinion they did not—that credit could not be imposed by the clause in question. The plain and only meaning of the clause "plus a fixed profit at the rate of two cents per pound" is, that after the cost of manufacture and cost of glue stock was determined, plaintiff should be billed at that cost, plus an additional sum equal to 2 cents per pound.

The second substantial question raised by the exceptions is whether interest on borrowed capital, under the contract, is a charge entering into the manu-

facture. This charge, if it is to be considered, would be in the computation of the first element of price. The defendant did borrow money to finance the operation of its plant, and in its system of accounting, the interest was apportioned and charged against its several departments. In the negotiations between Adamson and Tunnell leading up to the execution of the contract, it was agreed that interest on borrowed money would be a proper charge to the cost of manufacture. The statement of costs presented to the plaintiff by the defendant on July 16, 1920, contained, under the heading of manufacturing expenditures, the item "interest." The statement on its face did not show whether interest on capital or interest on borrowed money, or both, was meant. However, at the interview following plaintiff's receipt of the statement, the basis of the interest charge appearing therein was fully explained to William Adamson and Schofield, representing the plaintiff, as well as the method of apportionment adopted in arriving at the amount applicable to glue manufacturing. Furthermore, the defendant had customarily charged interest on borrowed money to cost of glue manufacture in its accounting system, in exactly the same manner prior to the execution of the contract as it did during the period of the contract. It would appear from the evidence that the plaintiff admits that it considered interest on capital investment a proper charge. The defendant, however, did not charge interest on its investment under this contract. Had it done so, the charge would have been greatly in excess of the charge actually made for interest on borrowed money.

A number of witnesses called by the plaintiff expressed the opinion that, in a correct method of accounting, interest should be deducted from profits, but should not be considered as an item entering into the cost of manufacturing. Other witnesses called by the plaintiff admitted that, as a matter of actual practice, interest on invested capital or on borrowed money should be charged to the cost of manufacturing.

The evidence does not show any custom or usage in the manufacturing business with respect to the treatment of interest in cost accounting.

While in a theoretically proper system of cost accounting interest on borrowed money may not be a charge against the cost of manufacture, in actual practice it is sometimes so charged.

The parties to this contract were practical glue makers. The defendant, in its uniform practice, did charge interest on borrowed money to the cost of the manufacturing of glue, and so informed the plaintiff before the contract was entered into, and thereafter, July 16, 1920, when the statement of costs, containing the charge of interest, was presented to the plaintiff. The latter then agreed that the charge was proper, and, with full knowledge, paid the interest so charged for the first year.

Under the evidence just reviewed, we are of opinion that "interest on borrowed capital" may be a charge entering into the cost of manufacturing, and it was shown as such charge entering into the manufacture of glue by the books of account of the defendant—the system of accounting evidently adopted by the parties as a standard for the determination of what should or should not be items constituting the first element of price. In this view, the charge plainly was within the terms of the contract. On the other hand, if, because of the absence of any reference to the subject "interest" in the contract, it be contended that a doubt arises as to the intention of the parties with respect to it, the intention of the parties is made plain by their contemporaneous conversations and conduct. The parties did not appear to have been guided in their dealings, before or after the contract was executed, by any theoretical method of cost accounting respecting the subject; on the contrary, the plain-

Baeder-Adamson Co. v. F. W. Tunnell & Co., Inc.

tiff, with full knowledge, accepted by conversation and conduct the actual practice of the defendant, and on that basis paid the charge at the end of the first year, after at least one-half of the glue, or about 1,000,000 pounds, had been manufactured and delivered. The parties, therefore, by their practical construction, show that they intended, under the general terms of the contract, to treat interest on borrowed capital as a charge entering into the cost of manufacture.

The trial judge refused to allow credit for value of by-product, and allowed interest paid on borrowed money as a charge to cost of manufacture. In these conclusions we agree.

NOTE.—See Baeder-Adamson Co. v. F. W. Tunnell & Co., Inc., 3 D. & C. 3.